Case number 161644, Power Survey, LLC v. L-3 Communications Holdings. Mr. Picard, you want three minutes for rebuttal? Yes, Your Honor. Thank you. Byron Picard on behalf of the Appellant Office, Power Survey, may it please the Court, this appeal... Clarify something for me early on, okay? At page 17 of the blue brief, you say, I'll read it to you, it's okay. On appeal, Power Survey does not challenge the sufficiency of L-3's prima facie case of obviousness, but does challenge the Board's findings in its evaluation of Power Survey's objective indicia of non-obviousness. I interpreted that statement to mean that you conceded your argument on appeal, but the statement seems to conflict with arguments you make throughout your blue brief that the EFA manual is not prior art reference. Am I correct in my interpretation or what? Yeah, I apologize that we weren't perhaps clear enough for Your Honor. What we were trying to get across with that statement is with the grant factors, we've got the secondary indicia of non-obviousness, that stands on par with the other elements of the prima facie case, and for this Court to address those, they have to weigh that against the prima facie showing of obviousness, but we weren't attacking whether they had, for example, had a missing element and so forth. But we are attacking whether the EFA manual was established as prior art based on properly admitted evidence. I hope that addresses Your Honor's question. So that was just unfortunate phrasing? I think so. Especially because we really have explained repeatedly that there is no such thing as a prima facie case of obviousness in IPRs. I think it is unfortunate phrasing and I believe that if you were to read the gist of the blue brief is that what we are saying is at the end of the day, the arbiter must look at this objective indicia and weigh it against the strength of the other obviousness evidence. But would we then, if we agree with you that they should have analyzed that objective indicia, do we have to remand? We believe that the constellation of errors here is sufficient to provide for a reversal, but a remand is, depending on how the Court views the strength of the objective indicia, could be an alternate remedy here. We have asked for that as well. What is your response to the argument that there isn't enough nexus shown as it relates to the secondary consideration? So, as we explained in our reply brief, there is a presumption of nexus where evidence is presented to show that there is a product that embodies the claims. We provided that to the Board below through declaration testimony. So when that product has commercial success, for example, there is a presumption that that success is tied to the patented product and therefore the invention. On the other elements, for example, the copying, we have the appellee's own efforts to copy what was admittedly our product. They were aware of our patent applications at the time. So there is evidence there of a nexus as well. I will say on that nexus question, the Board really didn't address the copying evidence at all. It said essentially, well, even if there was evidence of copying, it wouldn't be enough, and they skipped over that step of the objective indicia inquiry. On your evidentiary argument, how do you get around the fact that we are supposed to view this as for an abuse of discretion? Your Honor is correct about the standard overview. If we look to Federal Rule 602, the burden is always on the petitioner and these IPRs. Rule 602 provides that there must be some evidence offered to establish that the witness had a personal knowledge for his or her testimony. If we look at Mr. Johnson's testimony here, his declaration on its face doesn't establish that. He says in paragraph 1, I make the following statements based on personal knowledge. And then he hedges a little bit and says, and records kept by NARDA in the ordinary course. And then he concludes his declaration, by the way, that was at Joint Appendix 4137. He concludes his declaration at paragraph 13, which is at Appendix 4140, saying, I hereby declare that all statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true. So we have three sources of information that he's offering in his deck. There's personal knowledge, there's information or statements based on review of documents, and then there's information and belief, which respectfully is often offered in instances where the individual has no personal knowledge. But he doesn't specify in his declaration which of those statements is based on personal information, which is based on documents, with perhaps the exception of the sales data, and which is based on personal knowledge. So we objected to this evidence as lacking personal knowledge, which triggered the ability of L3 to offer supplemental evidence. And that could have been by additional testimony from Mr. Johnson, could have been by testimony from an entirely different witness, and L3 chose not to provide any supplemental evidence. We then took Mr. Johnson's deposition to determine whether, in fact, he had personal knowledge of this. And I would like to keep this Court's mindful of the fact that the Board's determination at the EFA was... Let me ask you two questions along that line. One, as far as I know, copyright dates are the dates something is distributed. Do you have any authority of a different event? That is not my understanding of what a copyright date suggests. So something enjoys copyright protection the moment it is reduced, an expression is reduced to a tangible form, and the author of a work or creator of a work can put that copyright notice on the work without ever distributing it to the public. And this Court's decision in In Re Lister essentially stands for the proposition that... In a printed version? Excuse me? In a printed version? Yes. We have here a printed manual, but the question is, was it disseminated to the public? And the only basis that the Board found that was Mr. Johnson's claim, his statement that there was a standard practice to include the manuals with sales of the units. And he doesn't explain in his declaration why or how he could have had personal information of that. We have his job title, and beyond that, all we have about his job duties are that he participated in editing the manual. When we take his deposition, he testified that he never witnessed the packing or shipment of units. There was no testimony that he was overseeing individuals who were responsible for that, that he gave any directions to include the manual. And so what we're left with is a witness that really doesn't have any information about the practices themselves for packaging the manuals with the products. And without that, Rule 602 is not... That's not the way I read the testimony, but according to Power Survey... I'm sorry, I in the red brief, L3 says, according to Power Survey, Johnson could not corroborate his testimony through written, formal written policies or other physical evidence, which it deems fatal. However, Power Survey failed to make these arguments before the Board and improperly raises them for the first time on appeal. Is that correct? No, it is not correct, Your Honor. I would direct your attention to Joint Appendix 1109. And this is the motion to exclude the Power Survey file before the Board below. And if you look at 1109, we say at the end of that single full paragraph there, but Mr. Johnson's testimony does not support these assertions because Mr. Johnson admitted during cross-examination that he does not have personal knowledge that the version of the EFA manual attached to his declaration was actually provided to customers, that it was ever posted to any website, or what NARA's practice actually was. When was that filed? I have a date here. It was filed with the Board on or about June 2, 2015. And procedurally, that typically comes toward the end of these IPR hearings, just before trial. It's a date that's provided for in the Board's scheduling order. So that was raised below to the Board. And I think it's important to keep in mind that this is not just a mere technicality. L3 had an opportunity to cure this. They could have gone to, say, the manager who was responsible for packaging equipment at this time. As it turns out, Mr. Johnson said there were bills of sales that might have shown what was provided with this equipment. He never looked at the bills of sale, either before his declaration or before his deposition in this case. I think a glaring omission here. If Mr. Johnson's testimony is not based on personal knowledge, then it was not properly admitted in this case. And the appropriate remedy here on appeal would be reversal because there's no other evidence that the Board relied on to establish the EFA manual. Before your time runs out, I want to move you back to the merits. In the blue brief, you say power surveys claim convention was innovative in two key respects. First, unlike any previous stray voltage detection technique, it was contactless in that the E field sensor need not touch the object to determine if it is energized. But the patents in suit say something else. For example, the 274 patent says in column 21, lines 1 to 5 and 16 to 22, once a detected stray voltage has been confirmed by the interface operator and an object has been determined to be the likely source of the anomaly, the interface operator may then proceed to record object-related information. For example, the interface operator may identify a lamppost as the potential source of a detected stray voltage anomaly and instruct the need for a utility crew to be dispatched. I read the 274 patent as stating only that the operator can identify the exact source of an elevated electric field. Can you explain that and then neutralize the field? Only the operator? As opposed to the person running the sensor system? Yes. So what the sensor system does is... It just finds that there is a spike. It finds there is a spike, but that spike is associated with a distance or time information which the operator and his truck can correlate to the urban landscape that is adjacent to the truck, in the example where the system is on a truck. So it is a very important innovation and it tells you that you have an electrified object that is emitting an E-field in very close proximity to the truck and that there is a confirmation in the kind of post-detection activities that might occur. You want to know how much energy is contained on that, for example, to determine is this a true emergency, do we need a crew right now, can we wait some time. How do you square your long-felt need argument with the argument that utilities were well aware of this problem, they just didn't care to do anything about it? Until there were a couple of high-profile cases and then regulation kicked in. So there is evidence in the record that there were efforts to find better ways of identifying these electrified objects even before the Jody Lane death. I think the most salient errors in the board's objective analysis was first with the copying. They sort of brush it off, they don't give it any true analysis. They seem to assume away, well, I'm not sure if there is any, but if there was it wouldn't be enough. And then when we turn to the skepticism and the failure of others, I think the board does the incorrect analysis because it misidentifies the problem. There was an explanation in our papers that in the prior arc there was a very labor-intensive process. People would go out on foot patrol, imagine you're in New York City, you've got literally tens of thousands of things that need to be touched, and there was a contact-based approach there as well. And the board sort of took that and said, well, you said you need a scalable, more efficient alternative to manual testing, and then they shift that and say, well, that must be contactless. And because others' efforts to find a better way to do this involved contact methods, there were skateboards and wheelchairs that would drag probes on contact with the sidewalk and that sort of thing. Those don't qualify as failures by others. In the same vein, we offered a category of evidence about skepticism of others, and the board, if you look closely at their opinion, doesn't address skepticism. In fact, one of the pieces of skeptical evidence that we offered was this Weisberger paper. They addressed that in the failure by others category, and frankly, even if they were to have properly done it in that category, they make an error, and they say, well, that failure isn't relevant here because it wasn't shown to have occurred before the priority date, and that's not the law here. Failures of others can occur after the priority date. Finally on the commercial success prong, the board gave very little weight to the commercial success here. And I think improperly discounted that evidence by saying that there were these catalyst events and regulatory changes that were the real driver, and if we look at it in sort of a different context, I don't think that makes sense. Imagine you have a valuable therapeutic out there. There's always going to be a catalyst event that makes someone choose one therapy over another. There's going to be an underlying health condition of symptoms or diagnosis of a physician, and the catalyst event is no different. Once these utilities realized there was a need for a solution, they looked out into the marketplace, and the power survey invention was the best alternative, and that's why they enjoyed tremendous commercial success. With that, we submit that there are two reversible errors that the board committed below. First, the admission of the Johnson testimony, without which EFA manual could be established as prior art. And secondly, the board's constellation of errors and considering the objective indicia of non-obviousness would also require a reversal or alternatively remand. Okay. We'll save the rest of your time for rebuttal. Thank you. It's not much, but we'll give it to you. Good morning, your honors. John Donahue, appearing on behalf of Appellee L3. Judge Luria was sitting today saying he would expect an electrifying argument. You're not really relying on the copyright issue, are you here? No, your honor. The copyright date issue is just one aspect of establishing that the EFA 300 manual was completed in 2002. It's certainly a factor that you're pointing to, but if you were to rely on that, you would have to establish that all of the elements necessary under 803 to classify it as a business record, right? Correct. And you didn't submit sufficient evidence for that, correct? I don't believe that's the case, your honor. I think that it depends. If you discount entirely the testimony of Mr. Johnson, then you may have a point that there isn't enough evidence under 803. There's two different things, whether or not he had personal knowledge and whether or not you've established a business record. Even if we accept the level of knowledge that you've laid out for Johnson, there's no way that that qualifies under 803 as a business record. He doesn't say he's the custodian of documents. That's correct, your honor. He does not, but he does establish that it was a document created by L3 that was completed in February of 2002. Well, he doesn't establish any of that. He says that I know that we made a manual at some point and I think that we sent them out, but he doesn't really establish when it happened. He doesn't establish where it was retained. He doesn't establish who ultimately made it. He doesn't have any of that. Your honor, he doesn't have all of that. I'll agree with you. He does not have all of it, but I think we have to look at Johnson, who Johnson is and what he's all about before we start trying to put into perspective what it is that he's saying. Johnson was the man at L3 for this product. This was his baby. He was the clear choice as the person to prepare to execute this declaration. He had worked there for 30 years since 1985. He was the director of instrument products, which included management of the EFA 300, the product at issue here. He was responsible for sales of instruments, including the EFA 300, the product at issue here. He was involved in reviewing and approving the English language version of the user manual for the EFA 300. During his deposition, he demonstrated detailed knowledge of how products are put together for shipping. He also said that he had no idea if the manual was actually included. He said their standard practice was to send manuals, but he said he didn't know if this manual was ever sent. Then he said, but you could have a bill of materials and you never offered to submit one. Your Honor, what he said is that it was the standard practice of the company to distribute a manual with every EFA 300 they sold. Again, just to help put this in perspective, we're talking about a manual that's over 200 pages long, and we're talking about a device that's thousands of dollars in expense and fairly sophisticated electronic equipment. During his deposition, he said that the packaging was assembled in Germany. It was put in a box. There was a bill of materials. He identified that. Which you never submitted. Which we did not submit, but our position is, of course, that we don't believe that that's necessary. There's a bill of materials that listed all the things that were supposed to be in the box. After an item was sold, it was shipped to the United States to the NARDA location on Long Island, where Mr. Johnson worked. He didn't testify that he ever opened one and found a manual in there. He did testify, Your Honor, that there was never a reason to open one. The issue, I think, in here, for this point, is what would be an issue that would... You're arguing what we used to call in law school a negative pregnancy. That is to say that he never received a phone call from a customer saying, where the hell is my instruction  He was never asked, Your Honor, if a customer ever complained that they did not receive a manual. Why didn't you ask him that? I mean, here's my problem. PTAB says we're doing formal proceedings, formal adjudicatory proceedings, even to the point where they say that such a level of formality that they can decide constitutional questions, and then they say, and they put everybody on notice, that we're going to apply the rules of evidence. What you're asking us to do is to apply the rules of evidence more loosely to the PTAB than we would to a district court in these circumstances. No, Your Honor. I don't believe so. The burden is on you to establish admissibility, not on them to say, well, you know, there were more holes. They pointed out an awful lot of holes in his testimony. Your Honor, they pointed out items that we could have addressed, but perhaps did not. The issue is... You didn't ask to supplementarily address them, did you? We did not supplement, Your Honor. The issue is whether what we put forward was sufficient. The board found that it was, and this court will look at what the board did to determine whether that was an abuse of discretion. Is it an abuse of discretion for the board to say we're going to rely on a person with 30 years of the company who was directly responsible for this product... But who had no knowledge of the specific facts. I mean, that's my problem. Your Honor, he didn't have knowledge of... He didn't watch it go into the box, and the board noted that. He did not watch it go into the box. He never put it into the box. He didn't have anything to do with printing it, or processing it, or shipping it? Well, Your Honor, he did approve it. He did not print it, but he approved the English language version. So why didn't you get someone who actually could testify to this? Would you have done this in district court? Your Honor, it depends on what the burden is here. And if the burden is beyond all doubt, of course we would have done that. If the burden is beyond a reasonable doubt, of course we would have done that. But that's not what the burden is here. And the issue is, L3's position is... The burden is personal knowledge. Is personal knowledge. And did Mr. Johnson have personal knowledge? He says he did. Everything indicates that he did. And the attacks of things he didn't do don't really attack his personal knowledge of what the standard practice was at the company for the dissemination of the manual. I thought the man was incredibly honest about all the stuff he didn't know. He was, Your Honor. Which was everything that would be necessary to establish that it ever was submitted to the public. Beyond a reasonable doubt, yes. Not beyond a reasonable doubt. That's not the standard. The standard is, did he have personal knowledge or did he not? And he didn't really even claim to have personal knowledge. He said, I have personal knowledge that we made a manual that I approved the text of. He didn't have any knowledge about it being printed or shipped or anything. He had personal knowledge that L3 put a copy of the manual in every box that they shipped that had the EFA 300 in it. He didn't say that. He did say that. He said that in his declaration. He said that the standard practice was to put a manual with every product. But he said he didn't know if it ever actually happened. Respectfully, Your Honor, that is not what he said, that he didn't know whether it actually ever happened. Cite to the record, please. Pardon me, Your Honor? Cite to the record. Well, Your Honor, in his declaration, he says... Where are you? This is in... His declaration is in the appendix at 1108 through 1111. I'm looking at 1108. In paragraph number three, he says that since at least 2002, it has been NARA's standard practice to include a user manual of each device, whether in the United States or around the world. Since at least 2002, each device sold by NARA has been delivered with a corresponding user manual. I'm sorry, but this is his declaration? Yes, Your Honor. You have the... At 1108? In the appendix. No, that's a brief. That's a brief. You don't have the right slide. I'm sorry, Your Honor. I apologize. It begins at 4136 and goes through 4141. It's just a couple of pages. Right, but then that is... You take that declaration and then you put it together with this cross-examination and you see a different picture, right? Your Honor, what you see is there are particular peripheral things that he does not know. But those peripheral things do not attack the basic premise that the standard practice at L3 was to include an EFA manual with every EFA 300 that they sold. No, he did not see it go into the box. No, he wasn't the one who put it into the box. He did state that. Your position is basically he's worked at this company for 30 years. He knows that it's the policy of the company to put manuals in the boxes. He actually looked at the specific language of the specific manual. Based upon all of that work experience and knowledge of policy, that's sufficient for the board to find that this is prior art. Yes, Your Honor, and that's what the board did. The difference is you're comparing a business practice with a business record. You don't have a custodian of records to establish a business record, but you have someone with expertise in the area to establish a business practice. Correct, Your Honor, and I believe that the issue here is the business practice. You're not trying to get this in under the business records exception. This is personal knowledge of the company's practices. Correct, Your Honor. I'd like to switch to some of the points that were being made about secondary considerations, if I may. How can we just ignore copying? That's pretty powerful evidence, right? Your Honor, I don't believe the board did ignore copying. If we look at... It certainly gave it the back of its hand at the best. It did, Your Honor, but it's fairly well settled in this court that evidence of copying alone is equivocal, and without more, it can be given the back of the hand. There's nothing wrong with that. In fact, it can be ignored completely if it's the only evidence of secondary considerations that's offered. What the board did, and they indicated this in the final decision, is they said that... Cite two pages. Certainly, Your Honor. Just a moment here. It's 28. I believe it is. Yeah, it is. And what the board said, under the totality of the evidence section, uh... the objective indicia of commercial success and copying weigh only slightly in favor of non-obviousness. So they did not ignore copying altogether. They did not... This is not a situation as some of the cases that were cited where the board just ignored blocks of evidence. They spent a lot of time on all of the secondary considerations and gave rulings on all of them. So I just want to point out a couple things. Um... Your Honor is absolutely right in that even with the power survey device, the L3 device, somebody riding along the street, they detect an elevated electric field and that's all they know. The only way to figure out what's going on is you have to stop the truck, get out, and figure out, okay, what's the source and is that source dangerous? Uh... Counsel did say that there was information that would allow someone to go back later and that is true, but they still have to do the same thing. The machine itself does not specifically identify the problem at issue. Um... That's the post-detection activity. The post-detection activity is more than just trying to figure out how serious it is. It's trying to figure out what it is in the first instance. Um... The second thing, Your Honor, that was pointed out in the opening had to do with failure of others. And in particular, the Voitsberger paper where the board said that they didn't prove that it was before the priority date, even though they said the board did say that, they nonetheless went on to completely analyze that reference and found that it did not count as a failure of others. In fact, just the opposite. It showed that someone else had succeeded, perhaps not as efficiently, but it did not come up as a failure of others. On commercial success, how do you address the argument on the other side that our case was very clear that where the product embodies all of the claims, there has to be a presumption of that there is a nexus. Correct, Your Honor. And that is this case. I know that's correct. That's what happened here, Your Honor. They don't say anything about providing a presumption. I'm sorry? They actually don't say anything about providing a presumption. They say that the patent owner had to prove a nexus. In connection with commercial success, which I believe they found that there was a nexus there, Your Honor, otherwise they wouldn't have considered the commercial success evidence. They did. And there was in this case, the expert witness on a power survey side did say that their commercial product was covered by the claims of the patent. They specifically found that there was no nexus without providing a presumption. Your Honor, regardless of whether they did or they did not say that there was a nexus, they nonetheless went on and considered what the commercial success evidence was. And came to the clear conclusion, based on the documents that are before us, that are in the record, that there was no commercial success. That there were other forces that caused the sales that were primary in resulting in the sales. In fact, Your Honor. You're out of time. Yeah, I think I am, Your Honor. I had a little trouble reading the clock here. Thank you. As we let him go over a minute, we'll give you two minutes for rebuttal. I'll endeavor to be shorter than that. Judge Wallach, I think, made an astute observation or question when my colleague was presenting and I think it was along the lines that they're relying on Mr. Johnson as a business person to establish a business practice. I think that's what the board found. If we look at the final written decision at JA33, they rely on Mr. Johnson's testimony about the standard practices at NARDA because everyone recognized he didn't have the actual knowledge of whether those particular manuals were shipped with those particular products. What's missing from Mr. Johnson's deck and which didn't come out at the deposition was, was Mr. Johnson the right businessman to make that statement? He doesn't say in his deposition how he had personal information about the packaging of manuals with the product. And what was illuminated at his deposition was he wasn't even in charge of the packaging of the product. That happened a continent away. But that's stuff that might be required if they were trying to get this in under the business practice exception. If I know that, you know, the people in my chambers do a certain thing because I've laid out informal policies that aren't written down, but I tell them to do them and I'm sure they do them, can't I testify to that fact? And whether that is credible or not is something for the fact finder, but not an abuse of discretion to allow it as evidence. I think your Honor's hypothetical is very informative. You could do that and that would be based on personal knowledge. We don't have Mr. Johnson saying, I've instructed anyone to do this. No, but he knows what the company's policy is. He doesn't have to be the person that actually wrote the policy if he's aware of the policy. But 602 requires him to say, how does he know? You couldn't offer literally... He's worked at the company for 30 years. He's in charge of this project. He actually looked at the manual and edited it. I mean, I don't know what, again, maybe he's not credible, but I don't know what more he has to do to say he has personal knowledge. All he has to do is, he literally could say, based on my experience because I oversee this, I instruct, I observed compliance with it, but he doesn't provide any of that testimony. He simply says, I've worked there, I have a particular job title. I'm in charge of it. Well, he says he's in charge of the sales and what we learned at his deposition that sales means something very different from sales fulfillment and he doesn't participate in the latter. He approves the language of the document. He doesn't know how the copyrights apply to it. He doesn't know the printing of it or any of that. So it was a very simple thing for L3 to have filled that gap and for reasons that are not on this record, they have not explained that. And I've already gone further, longer than I had hoped. So thank you for your time. All right, the case is submitted.